COLORADO COURT OF APPEALS                                   2016COA112

Court of Appeals No. 15CA1953
Moffat County District Court No. 13JV34
Honorable Michael A. O'Hara, Judge

The People of the State of Colorado,

Petitioner-Appellee and Cross-Appellant,

In the Interest of L.K., a Child,

and Concerning C.K.,

Respondent-Appellant and Cross-Appellee.

_____

JUDGMENT AFFIRMED AND ORDERS REVERSED

Division II
Opinion by JUDGE WEBB
Ashby and Harris, JJ., concur

Announced July 14, 2016

_____

Brett Barkey, County Attorney, Rebecca Tyree, Assistant County Attorney,
Craig, Colorado, for Petitioner-Appellee and Cross-Appellant

Heather Cannon, Guardian Ad Litem

Salky Law, LLC, Randall P. Salky, Steamboat Springs, Colorado, for
Respondent-Appellant and Cross-Appellee

¶ 1    In this dependency and neglect proceeding, C.K. (father) appeals from the judgment terminating the parent-child legal relationship between him and his daughter, L.K. We affirm the judgment.

¶ 2    On cross-appeal, the Moffat County Department of Social Services (MCDSS) challenges the trial court's order requiring payment of $400 to father's attorney, as a discovery sanction, on the basis that, among other reasons, it violated sovereign immunity. This question has not been addressed in Colorado. After considering federal precedent, we conclude that, because this sanction violated sovereign immunity, it must be set aside.

## I.  Background

¶ 3    In August 2013, MCDSS devised a protective plan for L.K., then five years old, after her outcry over sexual abuse by father. MCDSS placed L.K. with M.K. (grandmother), and contact between father and L.K. was prohibited. In October, after father was seen contacting L.K. in violation of the protective plan, MCDSS removed her from grandmother's home. Then it filed a petition in dependency and neglect.

¶ 4     At the first hearing, the court advised father that he was the focus of a criminal investigation arising from L.K.'s report of abuse; the offenses being investigated were "serious offenses," which could lead to a lengthy prison term; and he should be careful about what he said because his statements could be available to other people and could potentially be used against him in a criminal case. The court also advised him that if L.K. was adjudicated dependent and neglected, a treatment plan would be adopted for him; if he failed to comply with it, either MCDSS or L.K.'s guardian ad litem (GAL) could move to terminate his parental rights; and if the court found that "sufficient proof" had been presented, his parental rights would be terminated.

¶ 5     Father stipulated that L.K. was dependent and neglected because she lacked proper parental care. The court accepted his admission and adjudicated L.K. dependent and neglected.

¶ 6     MCDSS proposed a treatment plan for father that required him, among other things, to successfully complete sex offender treatment. Although the plan did not specifically require him to take a polygraph examination, it did require him to "participate in a psychosexual evaluation and complete other assessments required

by the evaluator" and "complete therapy according to SOMB standards."[1]

¶ 7     When the court approved the treatment plan, father was not present — allegedly because MCDSS failed to advise him of a change in the hearing date — and he was not represented by counsel.[2]  The attorney for MCDSS told the court that father continued to deny having sexual contact with L.K. but had indicated that he understood MCDSS would be seeking treatment for alleged improper sexual contact.  Counsel also said that she believed father would say that he was "not in favor" of such treatment, but she was under the impression that he would be willing to do it if the court ordered it.

¶ 8     Later, and still without counsel, father sent a letter to the court objecting to "taking a lie detector test."  But he did so on the ground that he understood such tests were "unscientific" and had a large margin of error.  He did not express any fear that a polygraph

---

[1] SOMB refers to the Sex Offender Management Board. § 16-13-902(2), C.R.S. 2015.

[2] Initially, father was not eligible for court-appointed counsel based on his earnings.  When the treatment plan was proposed, he had not yet retained private counsel.  However, the trial court found that father had "had knowledge and notice" of the hearing.

examination might require him to incriminate himself. And otherwise, he did not contest the treatment plan.

¶ 9 In January 2014, father retained counsel, who told MCDSS that father could not complete SOMB-approved treatment because he refused to admit that he had sexually abused L.K. and no criminal charges were pending against him. At a later status hearing, counsel provided this information to the court, and the caseworker confirmed that SOMB-approved providers would not treat father under these circumstances.

¶ 10 Father's retained counsel also requested a protective order under section 19-3-207, C.R.S. 2015, precluding use of any statements made during treatment in later criminal proceedings. The court entered the order. But the court never ruled on father's letter objecting to "taking a lie detector test." Nor did his attorney ask the court to treat the letter as a motion and rule on it.

¶ 11 In April 2014, father completed a sex offense specific evaluation by an SOMB-listed evaluator. Noting that father completely denied any inappropriate sexual behavior, the evaluator recommended that father take a polygraph examination to determine the next step. If the results indicated that he was

4

truthful, he would not be viewed as an appropriate candidate for offense specific treatment. But, if the results showed deception and he continued to deny inappropriate sexual behavior, he could participate in a "denier's intervention" program "for the purpose of helping him reduce his denial and defensiveness in preparation for a traditional offense specific treatment program."

¶ 12    MCDSS proposed that father's treatment plan be amended to include the evaluator's recommendations. This time, he did not object to any aspect of the amended plan. The court amended the plan.

¶ 13    After father completed the first polygraph examination in June 2014, efforts were made to find a treatment provider for him. But, during a hearing on September 17, he told the court that he still could not find a treatment provider who would work with him.

¶ 14    In October 2014, the court expressed concern that father's treatment plan might be "impossible" because he could not find a provider who was willing to treat him. The court ordered MCDSS to find a provider for father. MCDSS was not successful.

¶ 15    In January 2015, at the court's request, father moved to modify his treatment plan. He requested, among other things, that

any reference to SOMB requirements or guidelines be eliminated, and that the therapy requirement be modified to remove any reference to denier's treatment or SOMB offense specific treatment. The motion did not specifically address completing a polygraph examination. Following a hearing, the court denied the motion and ordered father to participate in denier's treatment.

¶ 16    Father was referred to an SOMB-approved provider for denier's treatment in March 2015. The provider tried several approaches to help him "open up" about his behavior, but nothing worked. Father met with the provider only four times. And he did not meet with or attempt to contact the provider after May 15.

¶ 17    Father told MCDSS that he could not pay for the second polygraph examination that was required as part of denier's treatment. After MCDSS agreed to pay for the examination, it was rescheduled for August. But father was terminated from treatment on July 20, under SOMB standards that require termination if a denier continues to be in full denial after ninety days. He never took the examination.

¶ 18    After denier's treatment ended, MCDSS moved to terminate father's parental rights, citing his failure to comply with his

treatment plan. During the three-day termination hearing, father's attorney cross-examined witnesses and made arguments on father's behalf. However, father chose not to testify and his attorney did not present any evidence.

¶ 19   Relying on the testimony of the denier's treatment provider and other witnesses, the court found, among other things, that father had been referred for a polygraph examination as part of denier's treatment, but he had not appeared for the examination. The court granted the termination motion, citing father's failure to successfully complete treatment designed to address the allegations of "sexual misbehavior" with L.K. as sufficient evidence that father was unable or unwilling to provide nurturing and safe parenting to adequately address her needs.

## II. Failure to Take the Polygraph Examination

¶ 20   Father first contends the trial court committed reversible error by considering the denier's treatment polygraph examination as evidence supporting its determination that he failed to successfully complete his treatment plan. We perceive no error.

## A. Additional Background

¶ 21 The court allowed MCDSS to present evidence of efforts to schedule an appointment for a polygraph examination during denier's treatment and evidence that father did not keep the appointment. In granting the termination motion, the court cited father's failure to successfully complete treatment designed to address the allegations of "sexual misbehavior" with L.K. The court specifically referred to father's failure to take the second polygraph examination required by the denier's treatment program as evidence of his failure to successfully complete treatment.

## B. Preservation and Standard of Review

¶ 22 Father preserved this issue by raising it in his closing argument at the termination hearing.[3] Whether the trial court improperly considered father's failure to take the polygraph examination is reviewed for an abuse of discretion. *See People v. Banks*, 2012 COA 157, ¶ 96 (holding that the trial court did not

---

[3] However, father's counsel did not then argue, nor had he argued at any earlier stage of the proceedings, either that father had been coerced into participating in denier's treatment or that the polygraph examination required by this treatment implicated father's privilege against self-incrimination. Father does not make either argument on appeal.

abuse its discretion in admitting testimony as to whether a polygraph examination was performed), *aff'd in part and rev'd in part on other grounds sub nom. People v. Tate*, 2015 CO 42.

## C. Law

¶ 23    "Evidence of polygraph test results and the testimony of polygraph examiners are per se inadmissible in both criminal and civil trials." *People in Interest of M.M.*, 215 P.3d 1237, 1248 (Colo. App. 2009). In *M.M.*, which involved termination of parental rights, the division held that evidence of polygraph examinations should not have been admitted, and the trial court should not have listened to or considered the opinions of any experts based in whole or in part on polygraph results. *Id.* at 1250.

## D. Application

¶ 24    According to father, the question before the trial court was whether evidence of polygraph examination *results* could be considered. Not so. The record shows the question to have been whether evidence of *compliance* (or lack thereof) with a polygraph examination requirement should be admitted and considered, and for what purpose. Because father never took the polygraph

examination required for denier's treatment, the court had no results to consider.

¶ 25     Father does not dispute either that his treatment plan required him to participate in denier's treatment or that a polygraph examination is required in denier's treatment. For these reasons, the court concluded that it could properly admit evidence of efforts to schedule an appointment for a polygraph examination during denier's treatment and evidence that father did not keep the appointment. We agree with the court that admitting this evidence did not violate the prohibition against considering polygraph results. Based on L.K.'s outcry over sexual abuse by father, the mandatory participation in sex offender treatment, and the treatment requirement that he take a polygraph examination, father's failure to take the examination was a proper matter for the court to consider in determining whether he had successfully completed his treatment plan.

¶ 26     Therefore, we conclude that the court did not err in admitting evidence of father's failure to take the polygraph examination required as part of the denier's treatment component of his

treatment plan and considering this evidence in terminating his parental rights.

### III.  The Burden of Proof

¶ 27    Next, father contends the burden was on MCDSS to prove by clear and convincing evidence that his parental rights should be terminated, but the trial court erred by unfairly shifting the burden of proof to him when he decided not to testify in the termination hearing.  Again, we perceive no error.

### A.  Additional Background

¶ 28    Neither MCDSS nor the GAL attempted to call father to testify at the hearing.  On the second day of the termination hearing, after MCDSS and the GAL had rested, the court inquired whether father intended to present any evidence.  After consulting with his attorney and being advised by the court of the consequences of his decision, father declined to testify or present any other evidence.  At that time, neither father nor his attorney mentioned a concern over self-incrimination.

¶ 29    Later, the court asked the parties to address in their closing arguments whether it could draw a negative inference from father's failure or refusal to participate in the polygraph examination

11

required by denier's treatment. The court cited *Asplin v. Mueller*, 687 P.2d 1329 (Colo. App. 1984), as a potentially relevant case, but it acknowledged that the opinion did not appear to be "on point."

## B. Preservation and Standard of Review

¶ 30 Father preserved the issue of whether the trial court improperly considered his choice not to testify when his counsel raised it in his closing argument at the termination hearing. However, counsel sought to dissuade the court from relying on *Asplin* by arguing that an adverse inference could not be drawn because unlike in that case, father had not declined to testify on Fifth Amendment grounds.

¶ 31 "The proper burden of proof is a question of law which we review de novo." *McCallum Family L.L.C. v. Winger*, 221 P.3d 69, 72 (Colo. App. 2009).

## C. Law

¶ 32 Under the Fifth Amendment to the United States Constitution, no person "shall be compelled in any criminal case to be a witness against himself."[4] The Fifth Amendment "also privileges [the

---

[4] Article II, section 18 of the Colorado Constitution similarly provides that "[n]o person shall be compelled to testify against

12

individual] not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973). And a witness protected by the privilege "may rightfully refuse to answer unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant." *Id.* at 78.

¶ 33    Even so, "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *see Sec. & Exch. Comm'n v. Colello*, 139 F.3d 674, 677 (9th Cir.1998) ("Parties are free to invoke the Fifth Amendment in civil cases, but the court is equally free to draw adverse inferences from their failure of proof.") (cited with approval in *Steiner v. Minn. Life Ins. Co.*, 85 P.3d 135, 141 (Colo. 2004)). And while refusing to testify may be necessary to prevent a waiver of the privilege, "[c]ourts generally have refused to find a

himself in a criminal case." Father does not argue that article II, section 18 provides any greater protection than the Fifth Amendment at trial.

13

[F]ifth [A]mendment violation when, as in this case, the refusal to testify does not automatically lead to sanctions." *Rosenberg v. Bd. of Educ.*, 710 P.2d 1095, 1100 n.11 (Colo. 1985).

¶ 34    In *Asplin*, a division of this court held that although in a criminal case instructing the jury that it may draw an inference of guilt from a defendant's failure to testify about facts relevant to his case is reversible error, in a civil case a party's refusal to answer questions by asserting the Fifth Amendment privilege against self-incrimination may be the basis for an inference that the answer would have been unfavorable to him.  687 P.2d at 1331-32.

### D.  Application

¶ 35    Father argues, as he did below, that *Asplin* is inapposite because he did not assert his privilege against self-incrimination as a reason for declining to testify at the termination hearing.  Instead, father continues, because he merely chose not to put on evidence, the court could not draw an adverse inference from this decision.

¶ 36    In closing argument, father's counsel understandably addressed whether the trial court could draw an adverse inference. After all, the court had raised *Asplin* sua sponte.  But by any fair reading, the record tells us that the trial court did not draw an

adverse inference from father's failure to testify or otherwise put on evidence. Still, father persists with this argument on appeal.

¶ 37 True enough, in the court's oral findings, it recognized "[t]he question about [father] not participating in the second polygraph examination and whether that can be used to draw an adverse inference." But then the court explained that, as with any respondent parent's failure to comply with a portion of a treatment plan:

> I would draw an adverse inference from that behavior. [Father] made a decision. And the reason for the decision doesn't really matter too much. He knew what was required, I'm convinced of that. He knew how to meet the requirement, and I'm convinced of that. He made a decision to stop complying.

¶ 38 In the written "Order Concerning Motion to Terminate Parent Child Relationship," the trial court noted only that father had not testified. Then, and without making any reference to either *Asplin* or drawing adverse inferences, the court found — from the testimony of other witnesses and not disputed by father — that he did not participate in a polygraph examination as required by the

denier's treatment element of his treatment plan.[5]  As a result, the court further found that "father failed to complete the treatment plan."  The record supports the court's holding that father's failure to successfully complete his denier's treatment — because he did not participate in a required polygraph examination — was similar to holding that a parent's failure to participate in any other activity required by the parent's treatment plan, such as drug testing to complete substance abuse treatment, resulted in a lack of compliance with the treatment plan.

¶ 39   Therefore, we conclude that when father failed to present evidence, the court did not improperly shift the burden of proof, infringe on father's privilege against self-incrimination, or draw impermissible adverse inferences.

## IV.  Sufficiency of the Evidence

¶ 40   Finally, father contends MCDSS did not prove its case by clear and convincing evidence.  Specifically, he asserts the absence of

---

[5] Although we discern no principled difference between the court's oral findings and its written order, "when a court makes oral findings and conclusions that differ from its final written rulings, the final written order controls."  *Thyssenkrupp Safway, Inc. v. Hyland Hills Parks & Recreation Dist.*, 271 P.3d 587, 589 (Colo. App. 2011).

16

such evidence that he had sexually abused L.K., which was the basis for the petition in dependency and neglect. We reject this contention because the question of father's wrongdoing was not at issue in the termination hearing.

## A. Additional Background

¶ 41    In terminating father's parental rights based on his failure to complete his treatment plan, the court did not make any findings whether father had sexually abused L.K. And the court specifically noted in its termination order that whether father in fact sexually abused L.K. was not an issue for it to decide at the termination hearing. Instead, the court found that the issue before it was whether father had complied with his treatment plan. Ultimately, the court concluded that because father had not completed his treatment plan, it had not been successful in rehabilitating him.

## B. Preservation and Standard of Review

¶ 42    In his closing argument to the trial court, father's counsel asserted that MCDSS had failed to present clear and convincing evidence that father had sexually molested L.K. Counsel also argued that father should not have been required to participate in and complete an SOMB-type treatment program, which was

17

"designed for failure" because completion of such treatment was not possible within a year, as required in an expedited permanency planning case.

¶ 43     "In determining whether the evidence is sufficient to sustain an adjudication, we review the record in the light most favorable to the prevailing party, and we draw every inference fairly deducible from the evidence in favor of the court's decision." *People in Interest of S.G.L.*, 214 P.3d 580, 583 (Colo. App. 2009).

C.  Law

¶ 44     A child may be adjudicated dependent and neglected if any of the circumstances set forth in section 19-3-102, C.R.S. 2015, is admitted or proven to exist.  For example, a child may be deemed dependent and neglected if "[a] parent . . . has subjected him or her to mistreatment or abuse" as provided in section 19-3-102(1)(a). But proof of abuse would not be necessary if the child is determined to be dependent and neglected on other grounds, such as lack of proper parental care as provided in section 19-3-102(1)(b).  And L.K. had been adjudicated dependent and neglected in November 2013, based on father's stipulation that she lacked proper parental care.

¶ 45    A court may terminate parental rights if it determines that the criteria in section 19-3-604, C.R.S. 2015, have been established by clear and convincing evidence.  And under section 19-3-604(1)(c), a parent's failure to comply with or successfully complete an appropriate treatment plan approved by the court is a factor that the court may consider in determining whether the criteria for termination have been established.  Such a treatment plan is one that "sets out a course of action that will 'help the parent overcome those difficulties which led to a finding that the child was neglected [and] dependent.'"  *E.S.V. v. People*, 2016 CO 40, ¶ 35 (quoting *People in Interest of C.A.K.*, 652 P.2d 603, 610 (Colo. 1982)).

## D.  Application

¶ 46    The question before the court at the termination stage was not whether a factual basis for adjudicating L.K. dependent and neglected existed.  That basis had already been established.  Instead, MCDSS had the burden of proving the criteria for termination, including, as the court noted, father's failure to comply with his treatment plan.

¶ 47    Because MCDSS was not required to prove that father had sexually abused L.K. to establish that at least one of the

19

termination criteria set forth in section 19-3-604(1)(c) had been met, and he does not contend that the evidence is otherwise insufficient, we reject his contention that the evidence was insufficient to support the judgment.

## V. Attorney Fees Sanction

¶ 48 On cross-appeal, MCDSS contends the trial court erred in assessing attorney fees against it for discovery violations in the absence of a case management order, a court order mandating discovery, or a stipulation as to discovery. It further contends the trial court erred in assessing attorney fees against a governmental entity, at least without finding a C.R.C.P. 11 violation. Addressing a novel question in Colorado, we conclude that sovereign immunity precludes orders assessing attorney fees against a governmental entity for discovery violations.[6]

### A. Additional Background

¶ 49 Both parties chose to handle discovery in a more formal manner than is typical of a juvenile court proceeding. Father propounded formal discovery requests to MCDSS. MCDSS filed a

---

[6] We express no opinion on the application of sovereign immunity to a monetary sanction against a governmental entity in any other context.

"Certificate of Compliance Pursuant to [C.R.C.P.] 26(a)(1)" to document each group of documents produced.

¶ 50     On May 9, 2014, father moved to compel discovery, asserting that although MCDSS had produced sixty-two pages of "alleged discovery," those documents did not include anything in several categories that had been requested several months earlier, and MCDSS had not responded to an interrogatory submitted at the same time.  He requested an order compelling MCDSS to respond to his discovery requests as well as sanctions.

¶ 51     Several months later, MCDSS responded to the motion to compel, explaining that it had not responded earlier because the attorney for MCDSS believed that the "remainder of discovery" sought by father had been provided to him on May 13, 2014.  Citing section 13-17-102(8), C.R.S. 2015, which provides that section 13-17-102 "shall not apply to . . . matters brought under the provisions of the 'Colorado Children's Code,'" MCDSS also argued that attorney fees could not be awarded in juvenile matters.  Father replied, detailing his reasons for dissatisfaction with the response to his discovery requests and renewing his request for sanctions.

¶ 52    During a later review hearing, the motion to compel was raised, the trial court asked about sovereign immunity, the parties presented arguments, and an agreement on how discovery would be handled going forward was reached.  A few weeks later, the court entered an order granting father's motion for sanctions.  The court approved the new "open file" policy that MCDSS was adopting, but it found that a discovery violation had occurred.  Adding that "this is not the first time that this court has heard similar complaints" about MCDSS, the court ordered MCDSS to pay $400 to father's attorney as a sanction under C.R.C.P. 37.

¶ 53    MCDSS moved to vacate the sanction order under C.R.C.P. 59. The court denied the motion without comment.

### B.  Preservation and Standard of Review

¶ 54    The same challenges to the attorney fees award that MCDSS asserts on appeal were addressed in the trial court.

¶ 55    Discovery rulings are within the discretion of the trial court and will not be disturbed absent an abuse of discretion.  *People in Interest of S.G.*, 91 P.3d 443, 450 (Colo. App. 2004).  The court's decision on imposing sanctions under C.R.C.P. 37 is also reviewed for an abuse of discretion.  *Winkler v. Shaffer*, 2015 COA 63, ¶ 7.  A

court abuses its discretion when it misunderstands or misapplies the law. *Reisbeck, LLC v. Levis*, 2014 COA 167, ¶ 7.

¶ 56 Sovereign immunity raises a jurisdictional issue. *Springer v. City & Cty. of Denver,* 13 P.3d 794, 798 (Colo. 2000). If the issue involves a factual dispute, the clearly erroneous standard of review applies to the trial court's findings of jurisdictional fact. But where the facts are undisputed, the appellate court reviews this issue de novo. *Id.*; *see also Churchill v. Univ. of Colo.*, 293 P.3d 16, 25 (Colo. App. 2010) (collecting cases), *aff'd*, 2012 CO 54.

## C. Law

¶ 57 A party may move to compel disclosure and for appropriate sanctions if another party fails to make a disclosure required by C.R.C.P. 26(a). C.R.C.P. 37(a)(2)(A). But C.R.C.P. 26, which governs disclosure and discovery in most civil matters, does not apply in expedited proceedings "[u]nless otherwise ordered by the court or stipulated by the parties." C.R.C.P. 26(a). A motion to compel is also available if a party fails to respond to formal discovery, such as by not answering an interrogatory or producing documents requested by the discovering party. C.R.C.P. 37(a)(2)(B). But because C.R.C.P. 37 does not contain similar language limiting

23

its application in expedited proceedings, the question remains whether this rule could apply where Rule 26 did not.

¶ 58 If a motion to compel is granted, or if the requested discovery is provided after the motion was filed, the court may require the party whose conduct necessitated the motion, that party's attorney, or both to pay to the moving party the reasonable expenses incurred in making the motion. Even so, attorney fees should not be awarded if the court finds that either the moving party did not first make a good faith effort to obtain the discovery without court action, or the opposing party's response was substantially justified or that other circumstances make an award of expenses manifestly unjust. C.R.C.P. 37(a)(4)(A).

### D. Application

#### 1. Availability of Discovery Sanctions

¶ 59 MCDSS argues that the court lacked authority to impose sanctions under C.R.C.P. 37 in the absence of either an agreement between the parties to conduct discovery under C.R.C.P. 26 or a court order mandating discovery and requiring the parties to conduct it under C.R.C.P. 26. Even if we assume that the trial court could impose sanctions under C.R.C.P. 37(a)(4)(A) without

having first entered an order making Rule 26(b) applicable, because MCDSS is a governmental entity, our inquiry must address sovereign immunity.

## 2. Sovereign Immunity

¶ 60    In 1971, citing the injustice and inequity that often resulted from the application of the doctrines of sovereign immunity and governmental immunity, the Colorado Supreme Court abrogated these doctrines for causes of action arising after June 30, 1972. *Evans v. Bd. of Cty. Comm'rs*, 174 Colo. 97, 99-106, 482 P.2d 968, 969-72 (1971).  The court declared that the situation was "in the hands of the General Assembly," which had the authority to restore sovereign immunity and governmental immunity in whole or in part, if it wished to do so.  *Id.* at 105, 482 P.2d at 972.

¶ 61    The General Assembly responded by enacting the Colorado Governmental Immunity Act (CGIA), currently codified at sections 24-10-101 to -120, C.R.S. 2015.  With certain exceptions not applicable here, section 24-10-108, C.R.S. 2015, provides that "sovereign immunity shall be a bar to any action against a public entity for injury which lies in tort or could lie in tort regardless of whether that may be the type of action or the form of relief chosen

25

by a claimant."  Injury is defined as "death, injury to a person, damage to or loss of property, of whatsoever kind, which, if inflicted by a private person, would lie in tort or could lie in tort." § 24-10-103(2), C.R.S. 2015.

¶ 62     This definition of injury shows why the CGIA is inapplicable to discovery sanctions.  The "injury" sustained by a party who has been disadvantaged by another party's failure to comply with rules governing discovery is not "death, injury to a person, damage to or loss of property, of whatsoever kind, which, if inflicted by a private person, would lie in tort or could lie in tort."  And, although torts involving litigation have been recognized in Colorado — *see, e.g.*, *Mintz v. Accident & Injury Med. Specialists, PC*, 284 P.3d 62, 65-66 (Colo. App. 2010) (discussing abuse of process and malicious prosecution), *aff'd*, 2012 CO 50 — we are unaware of any Colorado authority treating failure to comply with discovery rules as a tort.

¶ 63     For these reasons, we conclude that the CGIA does not apply to discovery sanctions.  But this conclusion only circles back to *Evans*, which ended governmental and sovereign immunity.  So, how could immunity still preclude the sanction at issue?

¶ 64    Colorado procedural rules and cases construing those rules provide some guidance.  For example, under C.R.C.P. 54(d):

> Except when express provision therefor is made either in a statute of this state or in these rules, reasonable costs shall be allowed as of course to the prevailing party considering any relevant factors which may include the needs and complexity of the case and the amount in controversy.  *But costs against the state of Colorado, its officers or agencies, shall be imposed only to the extent permitted by law.*

(Emphasis added.)  In *City & County of Broomfield v. Farmers Reservoir & Irrigation Co.*, 239 P.3d 1270, 1278-79 (Colo. 2010), our supreme court noted that this rule serves to "protect the public treasury, which, in turn, is consistent with the concept that the government cannot be sued without its consent."  The court further observed that "[t]he legislature alone has the power to balance the interests between protecting the public against excessive financial burdens and allowing individual parties to sue the government."  *Id.* at 1279.

¶ 65    Still, the specific question before us — whether sovereign immunity bars an award of attorney fees against a public entity under C.R.C.P. 37 — remains unresolved in Colorado.  Because the state and federal versions of Rule 37 are substantially similar,

27

federal court decisions provide guidance in construing C.R.C.P. 37. *Garcia v. Schneider Energy Servs., Inc.*, 2012 CO 62, ¶ 7.

¶ 66 To be sure, some federal courts have ordered monetary sanctions against government attorneys, citing statutory language or procedural rules as authority for doing so. *See, e.g., Chilcutt v. United States*, 4 F.3d 1313, 1325-27 (5th Cir. 1993) (affirming order requiring government attorney to personally reimburse plaintiffs for attorney fees incurred because of the government's discovery abuse). Based on 28 U.S.C. § 2412 (2012), a provision of the Equal Access to Justice Act (EAJA), the *Chilcutt* court concluded that Congress intended to subject the government and its attorneys to Fed. R. Civ. P. 37(b)(2)(E) (now found at Fed. R. Civ. P. 37(b)(2)(C)), under which the court could order "the recalcitrant party, the attorney, or *both*" to pay reasonable expenses, including attorney fees, to the opposing party for violations of discovery orders. 4 F.3d at 1326. The court noted that the EAJA specifically deleted subsection (f) of Rule 37, which had precluded courts from imposing discovery sanctions on the United States. *Id.* at 1325-26.

¶ 67 At the same time, federal courts have been reluctant to impose monetary sanctions against a government agency — as opposed to a

government attorney — absent language that specifically authorizes such sanctions. "[A] provision authorizing sanctions does not automatically waive sovereign immunity, and thus does not apply, without more, to fee awards against the government." *In re Graham*, 981 F.2d 1135, 1139-40 (10th Cir. 1992) (finding no waiver of sovereign immunity "sufficiently explicit" in the Federal Rules of Bankruptcy Procedure to justify awarding fees against the government for, among other things, failure to produce certain documents).

¶ 68     In other words, "[a] waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text," and will not be implied. *Lane v. Pena*, 518 U.S. 187, 192 (1996). Thus, although generally "it is unassailable that a court's inherent authority includes the power to assess attorneys' fees or other monetary fines against either parties or their attorneys," absent a waiver of sovereign immunity, that power "does not encompass the authority to impose monetary sanctions against the government." *Alexander v. Fed. Bureau of Investigation*, 541 F. Supp. 2d 274, 301 (D.D.C. 2008).

¶ 69    C.R.C.P. 37(a)(4)(A) permits a trial court to order a party, that party's attorney, or both to pay the "reasonable expenses" incurred by an opposing party who has had to file a motion to compel as a result of the failure of the party or the party's attorney to make disclosures or provide discovery as required by the rules governing discovery. But C.R.C.P. 37 does not expressly authorize an award against a public entity. Nor are we aware of any Colorado authority that permits such an award.

¶ 70    Given all this, we conclude that the trial court's sanctions order must be set aside.

## VI.  Conclusion

¶ 71    The judgment terminating the parent-child legal relationship between father and L.K. is affirmed. The order requiring MCDSS to pay $400 to father's attorney, as well as the order denying post-trial relief to MCDSS, is reversed.

JUDGE ASHBY and JUDGE HARRIS concur.