23CA1877 Peo in Interest of MV Jr 10-17-2024

COLORADO COURT OF APPEALS

Court of Appeals No. 23CA1877
El Paso County District Court No. 23JV6
Honorable Jessica L. Curtis, Judge

The People of the State of Colorado,

Appellee,

In the Interest of M.V., Jr., a Child,

and Concerning T.A.V.,

Appellant.

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE BROWN
Graham* and Richman*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 17, 2024

Kenneth R. Hodges, County Attorney, Shannon Boydstun, Assistant County Attorney, El Paso, Colorado, for Appellee

Josi McCauley, Guardian Ad Litem

Andrew A. Gargano, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1    In this dependency and neglect action, T.A.V. (mother) appeals the judgment adjudicating M.V., Jr. (the child) dependent and neglected.  We affirm.

## I.    Background

¶ 2    The El Paso County Department of Human Services (the Department) filed a petition in dependency and neglect, alleging that (1) the child tested positive for substances at birth and showed signs of withdrawal; (2) mother refused medical treatment for the child; and (3) mother tested positive for methamphetamine while pregnant.  Mother denied the allegations in the petition and initially requested a jury trial.  She later requested the jury trial be converted to a bench trial.

¶ 3    The Department moved for summary judgment on the grounds that the child was (1) born affected by substances and his health or welfare was threatened by substance use and (2) in an injurious environment.  The juvenile court granted partial summary judgment, finding there was no genuine issue of material fact that the child tested positive at birth for methamphetamine.

¶ 4    After a bench trial on the remaining issues, the juvenile court adjudicated the child dependent and neglected.  In doing so, the

court found by a preponderance of the evidence that (1) the child was born affected by methamphetamine exposure, and his health or welfare was threatened by substances; and (2) the child was in an injurious environment.

## II.    Right to Jury Trial

¶ 5    Mother contends that the juvenile court erred by denying her right to a jury trial at the adjudicatory stage.  We disagree.

## A.    Additional Background

¶ 6    Upon mother's request, the court set an adjudicatory jury trial.  But at the pretrial readiness conference, mother's counsel requested a bench trial, and the parties agreed to continue the matter.

¶ 7    At the next pretrial readiness conference, the court confirmed mother's request for a bench trial in the following colloquy:

> THE COURT: [Mother], are you all right, ma'am, with your case not being heard by a jury?
>
> MOTHER: Yes.
>
> THE COURT: But by a [j]udge?
>
> MOTHER: Yes.

THE COURT: So do you understand that you're giving up your right to have your case heard in front of a jury?

MOTHER: Yes.

THE COURT: I ask this next question of everyone when they're making important decisions in court.  This is an important decision to have your case heard in front of a [j]udge rather than a jury.  Are you under the influence today of any alcohol, drugs or medications which could impact your thinking?

MOTHER: No.

The court found that mother's waiver of her right to a jury trial was knowing, voluntary, and intelligent and set the matter for a bench trial.

¶ 8        One month later, when the parties convened for the bench trial, mother asked for a continuance and to discharge her attorney. Mother told the court, "I can do the bench trial by myself."  The court appointed new counsel and found good cause to continue the bench trial to give mother's new counsel time to prepare.

¶ 9        Two months later at the adjudicatory bench trial, mother's new counsel asserted that "it was my understanding that this case was on for a jury trial."  Counsel asserted that mother "continues to maintain her right to a jury trial," the initial request for a jury trial

was timely made, and "we are asking that that has not been waived." Counsel stated that mother had "demanded the jury trial" during the last pretrial conference. Counsel further argued that mother never withdrew her request for the jury trial and asked for a continuance so a jury could be called.

## B. Effective Waiver

¶ 10 Mother acknowledges that she waived her right to jury trial but argues that her waiver was not voluntary because it was influenced by her first attorney, the court, or both. We are not persuaded.

### 1. Applicable Law and Standard of Review

¶ 11 After a department files a petition in dependency and neglect, a parent may demand a jury trial and require that the state prove the allegations of the petition at the adjudicatory stage of the proceeding. § 19-3-202(2), C.R.S. 2024. A parent may also waive their statutory right to a jury trial, either expressly or impliedly, so long as the waiver is voluntary. *People in Interest of J.R.M.*, 2023 COA 81, ¶ 9. A waiver is voluntary if "the choice to waive was free and deliberate and was made without intimidation, coercion, or deception." *Poudre Sch. Dist. R-1 v. Stanczyk*, 2021 CO 57, ¶ 24. A

4

statutory right may be waived by the party or their counsel. *See People v. Baird*, 66 P.3d 183, 190 (Colo. App. 2002).

¶ 12    Challenges to effective waiver are mixed questions of fact and law; we accept the court's factual findings when those findings are supported by the evidence and assess the legal significance of the facts de novo. *People in Interest of B.H.*, 2021 CO 39, ¶ 50. Although the parties dispute preservation, because we conclude that the juvenile court did not err, we need not resolve that dispute.

## 2.    Analysis

¶ 13    Mother's decision to waive her right to a jury trial and pursue a bench trial was discussed in at least four hearings over the course of four months. In March, mother's counsel requested a bench trial; in April, mother told the court directly that she wished to waive her right to a jury trial; in May, mother indicated she could "do the bench trial by [her]self"; and, in June, the court confirmed on the record with mother present that the matter had been set for a bench trial.

¶ 14    The first time mother indicated that she had not waived her right to a jury trial was via newly appointed counsel on the morning of the bench trial in July. Even then, counsel did not argue that

5

mother had been unduly influenced either by her former counsel or by the court such that her prior waiver had been involuntary. Instead, counsel appears to have misunderstood the record because she represented that mother had made a timely demand for a jury trial, had not waived that right, and had "demanded a jury trial" in May. Although the record reflects that mother indeed made a timely jury demand, it belies counsel's claims that mother never waived that right and renewed the demand in May.

¶ 15    Even considering mother's claim — raised for the first time on appeal — that her waiver was not voluntary, we are not persuaded. Nothing in the record reveals that mother was intimidated, coerced, or deceived to relinquish her right to a jury trial. *See Stanczyk,* ¶ 24. Although mother expressed displeasure with her first attorney because she felt that he "d[id] not want to go to trial," nothing in the record suggests that counsel pressured her to choose one kind of trial over another.

¶ 16    Similarly, nothing in the record indicates that the juvenile court induced mother's waiver. In fact, the court advised mother that it was her decision alone whether to go to trial and that if she chose to go to trial, "even though that's not [your attorney's]

6

advice . . . he will represent you and he'll do a good job." Mother argues that "[i]mpelled by the court's assurance, [m]other resultantly yielded when [counsel] immediately requested a bench trial." But the highlighted colloquy between mother and the court occurred a month *after* mother first waived her right to a jury through counsel, did not differentiate between a jury trial and a bench trial, and came *before* mother confirmed without apparent hesitation that she wished to proceed with a bench trial.

¶ 17    Given this record, we perceive no error in the juvenile court's determination that mother voluntarily waived her right to a jury trial.

### C.    Revocation of Waiver

¶ 18    Mother next contends that even if her waiver was voluntary, the juvenile court erred by denying her request to revoke the waiver. We perceive no error.

### 1.    Applicable Law and Standard of Review

¶ 19    Although there is no prohibition against revocation or withdrawal of a waiver, "even waivers of fundamental trial rights are typically not subject to revocation as a matter of right." *Reyes v. People,* 195 P.3d 662, 666 (Colo. 2008). Divisions of this court have

7

encouraged trial courts to weigh a variety of factors when considering whether to revoke a waiver, including (1) the timeliness of the request; (2) the effect of granting the revocation on other parties; (3) the reasonableness of the reason to revoke; (4) the circumstances surrounding the initial waiver; and (5) any other relevant circumstances. *See People v. Martin*, 2014 COA 112, ¶¶ 39, 46, 51, 53, 55; *see also People v. Maestas*, 199 P.3d 713, 717 (Colo. 2009).

¶ 20     If the statutory right to a jury trial has been effectively waived, we review the juvenile court's decision whether to revoke the waiver for an abuse of discretion. *See Reyes*, 195 P.3d at 666. A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair or when it misapplies the law. *People in Interest of A.N-B.*, 2019 COA 46, ¶ 9.

### 2.    Analysis

¶ 21     Mother's second attorney asserted that mother had never waived her right to a jury trial. The juvenile court construed this argument as a request to reinstate mother's right to a jury trial. In denying that request, the court found it "had a very specific and detailed conversation" with mother, after which it "found that

8

[mother]'s waiver of her right to jury trial was knowing, intelligent, and voluntary." It said, "She's waived jury. We won't be going back."

¶ 22    Mother now contends that the juvenile court abused its discretion by denying her request to revoke her waiver because the waiver was not effective for the reasons discussed above. As we have explained, mother's waiver was effective.

¶ 23    Moreover, several factors support the court's decision not to allow mother to revoke her waiver. Mother confirmed her desire for a bench trial multiple times over multiple months. The adjudicatory trial had already been continued for several months and had been set outside the statutory timeframe in this expedited permanency planning case. *See* §§ 19-3-505(3), -508(3)(a), C.R.S. 2024. And mother waited until the morning of the hearing to request to revoke her waiver. *See People v. McCormick*, 839 P.2d 474, 481 (Colo. App. 1992) (holding no abuse of discretion when request was denied as untimely because it was made on the day of trial), *rev'd on other grounds*, 859 P.2d 846 (Colo. 1993).

9

¶ 24    Thus, we conclude that the juvenile court's refusal to reinstate mother's jury trial was not manifestly arbitrary, unreasonable, or unfair.  *See A.N-B.,* ¶ 9.

## III.    Summary Judgment

¶ 25    Mother next contends that the juvenile court erred by partially granting the Department's motion for summary judgment.  We are not persuaded.

### A.    Applicable Law and Standard of Review

¶ 26    As pertinent here, a child is dependent and neglected if "[t]he child is born affected by alcohol or substance exposure, except when taken as prescribed or recommended and monitored by a licensed health care provider, and the newborn child's health or welfare is threatened by substance use."  § 19-3-102(1)(g), C.R.S. 2024.  Generally, whether a child is dependent or neglected presents a mixed question of fact and law because it requires the application of the statute to evidentiary facts.  *People in Interest of S.N. v. S.N.,* 2014 CO 64, ¶ 21.

¶ 27    Although summary judgment is available in dependency and neglect cases, it is a drastic remedy and is only appropriate when there is no genuine issue as to any material fact and the moving

party is entitled to judgment as a matter of law. *Id.* at ¶ 12; *see also* C.R.C.P. 56(c). The moving party may use pleadings, depositions, answers to interrogatories, admissions on file, and affidavits to meet this burden. C.R.C.P. 56(c). While the form of the evidence supporting a motion for summary judgment need not be admissible at trial, the content or substance of the evidence must be admissible. *S.N.*, ¶ 16.

¶ 28 If the moving party does not meet its initial burden, summary judgment must be denied. *People in Interest of M.M.*, 2017 COA 144, ¶ 13. But if the moving party meets its burden, the nonmoving party must demonstrate a controverted factual question. *S.N.*, ¶ 16. A court must give the nonmoving party all favorable inferences that can be drawn from the undisputed facts. *Id.* While failure to respond to a motion for summary judgment or file opposing affidavits can be risky, "the absence of a response does not relieve the moving party of its burden to establish that summary judgment is appropriate." *USA Leasing, Inc., L.L.C. v. Montelongo*, 25 P.3d 1277, 1278 (Colo. App. 2001).

¶ 29 We review de novo a juvenile court's grant of summary judgment. *M.M.*, ¶ 11.

11

## B. Additional Facts

¶ 30 Before the adjudicatory trial, the Department served requests for admissions and interrogatories on mother. Among other things, the Department asked mother to admit that (1) the child tested positive at birth for methamphetamine, "which places the welfare of the [c]hild at risk"; (2) the child showed signs of withdrawal at birth; and (3) the child's umbilical cord test results, which it attached, were admissible at an adjudicatory trial.

¶ 31 When mother did not respond to the discovery requests, the Department moved for summary judgment, asserting in relevant part that the child had been born exposed to substances and that substance exposure negatively impacts children. The Department submitted (1) the umbilical cord test results, which included a chain of custody certification, accompanied by an affidavit from the records custodian from the drug testing laboratory; and (2) an article and affidavit from Dr. Garcia-Jones discussing the risks of in utero methamphetamine exposure. The Department also asserted that, because mother did not respond to the requests for admission, she had effectively admitted to the substance of the requests, which

12

included the allegations from the petition. Mother did not respond to the motion.

¶ 32 At the beginning of the adjudicatory trial, the Department again requested summary judgment, arguing that the attachments to the motion were admissible and that mother had failed to respond to the motion. After hearing argument, the juvenile court granted partial summary judgment and found that "there [wa]s no genuine issue of material fact as to the fact that . . . [the child] tested positive at birth for . . . methamphetamine." However, the court also found that because Dr. Garcia-Jones's affidavit was "not specific to this child," there remained a genuine issue of material fact whether "the newborn child's health or welfare [wa]s threatened by substance use" under section 19-3-102(1)(g). The court noted that it therefore "remain[ed] the county's burden to prove . . . whether those substances were prescribed or recommended and monitored by a licensed health provider and that the newborn child's health or welfare [wa]s threatened by substance use."

C.    Entry of Partial Summary Judgment

¶ 33 As best we understand, mother argues that the court granted summary judgment because she failed to respond to the

Department's discovery requests and motion for summary judgment but that the failure to respond was the result of ineffective assistance of counsel, so we should unwind the summary judgment order.

¶ 34     Divisions of this court have recognized that a parent's statutory right to counsel includes the right to effective assistance of counsel. *See People in Interest of A.R.*, 2018 COA 177, ¶ 37, *aff'd on other grounds sub nom. A.R. v. D.R.*, 2020 CO 10; *People in Interest of S.L.*, 2017 COA 160, ¶ 58; *People in Interest of C.H.*, 166 P.3d 288, 290 (Colo. App. 2007). To successfully make an ineffective assistance of counsel claim, a parent must show that (1) counsel's performance was outside the wide range of professionally competent assistance, and (2) the parent was prejudiced by counsel's errors. *A.R.*, ¶ 48; *C.H.*, 166 P.3d at 291-92. To show prejudice, the parent must show a reasonable probability that the outcome of the proceeding would have been different but for counsel's deficient performance or unprofessional errors. *A.R.*, ¶ 60.

¶ 35     In granting partial summary judgment, the juvenile court found there was no genuine issue of material fact that the child

tested positive at birth for methamphetamine. We agree with mother that the court based this finding at least in part on mother's failure to respond to the motion for summary judgment, which alleged that the child had tested positive at birth and attached the child's umbilical cord results. But assuming, without deciding, that mother's counsel was ineffective for failing to respond to the motion, mother fails to demonstrate the requisite prejudice because the umbilical cord results were independently admissible and considered by the juvenile court at the adjudicatory trial.

¶ 36　True, the juvenile court admitted the umbilical cord results at the adjudicatory trial "based on the Court's ruling granting partial summary judgment." But it appears to be uncontested that the test results and accompanying affidavit met the requirements for self-authentication under CRE 902(11). Still, mother argues that the umbilical cord results were not authentic because a chain of custody was not established.

¶ 37　The standard for authenticity is low and requires "only a prima facie showing" that the proffered evidence is what the proponent claims it to be. *People v. N.T.B.*, 2019 COA 150, ¶ 16 (citation omitted); *see* CRE 901(a). And "extrinsic evidence of

authenticity as a condition precedent to admissibility is not required with respect to . . . [c]ertified [d]omestic [r]ecords of [r]egularly [c]onducted [a]ctivity."  CRE 902(11).

¶ 38     Even so, the court allowed mother to challenge the authenticity of the test results and accompanying documentation. Mother testified that she believed that the test results were "not correct."  Mother explained that the results were returned too quickly and did not contain levels for some substances that showed positive.  Mother testified, "[Y]ou should look at that again.  You should go look."

¶ 39     The court weighed the evidence, specifically considering mother's testimony.  The court found that mother offered "no explanation" for methamphetamine appearing in the child's umbilical cord testing "other than saying the test [wa]s inaccurate." The court found that "mother's disbelief in the cord testing [wa]s not credible."

¶ 40     It is within the juvenile court's purview to weigh evidence, including conflicting evidence, and determine witness credibility. *See In re Marriage of Kann*, 2017 COA 94, ¶ 36 ("[O]ur supreme court has . . . expressed unbridled confidence in trial courts

to weigh conflicting evidence."); *see Carrillo v. People*, 974 P.2d 478, 486 (Colo. 1999) (recognizing "the trial court's unique role and perspective in evaluating the demeanor and body language of live witnesses" and "discourag[ing] an appellate court from second-guessing those judgments based on a cold record"). And in the end, mother did not offer anything beyond speculation to demonstrate that the chain of custody certifications included on the face of the child's umbilical cord test results report were not reliable. *See People v. Valencia*, 257 P.3d 1203, 1206 (Colo. App. 2011) (holding that "[s]peculation of tampering is insufficient to establish a break in the chain of custody").

¶ 41    Thus, the juvenile court acted well within its discretion in admitting the umbilical cord results at the adjudicatory trial. Because the umbilical cord results were admissible independent of mother's failure to respond to the Department's motion for summary judgment, mother suffered no prejudice as a result of her counsel's failure to respond to the motion. *See People v. Phillips*, 2012 COA 176, ¶ 63 (we may uphold the trial court's evidentiary decision on any ground supported by the record, even if that ground was not articulated or considered by the trial court). And

because mother's ineffective assistance of counsel claim fails, *see A.R.*, ¶ 60, we see no reason to reverse the juvenile court's entry of partial summary judgment.

## IV. Disclosure of Expert Testimony

¶ 42 Mother next contends that the juvenile court erred by allowing the testimony of two expert witnesses the Department failed to disclose properly. We are not convinced.

### A. Standard of Review and Applicable Law

¶ 43 Hearings in dependency and neglect actions may be conducted informally. § 19-1-106(2), C.R.S. 2024. This does not mean, however, that rules of procedure may be ignored as "mere exercises in formalism." *People in Interest of D.M.F.D.*, 2021 COA 95, ¶ 30.

¶ 44 The disclosure and discovery rules set forth in C.R.C.P. 26 may apply to dependency and neglect actions when ordered by the juvenile court. C.R.C.P. 26(a); *People in Interest of K.T.*, 129 P.3d 1080, 1082 (Colo. App. 2005). In cases where the rule applies, a court has "considerable discretion" to impose sanctions for failure to comply. *Todd v. Bear Valley Vill. Apartments*, 980 P.2d 973, 978 (Colo. 1999). Sanctions, including those enumerated in C.R.C.P. 37(c), should be "directly commensurate with the prejudice caused

18

to the opposing party." *Trattler v. Citron*, 182 P.3d 674, 682 (Colo. 2008).

¶ 45    In determining whether a party's disclosure violations prejudiced the other party, courts have considered whether any late-disclosed evidence surprised the other party, whether the other party was offered a continuance, and whether the other party had adequate time and opportunity to respond to the late-disclosed evidence even without a continuance. *See, e.g., Berry v. Keltner*, 208 P.3d 247, 250-51 (Colo. 2009) (holding that a late disclosure did not prejudice the other party where that party had ample opportunity to depose the newly disclosed witness and, thus, could not viably claim surprise); *Todd*, 980 P.2d at 980 (holding that a late disclosure was harmless where the case was continued for reasons independent of discovery matters, thus giving the other party sufficient opportunity to prepare its case); *People v. Milton*, 732 P.2d 1199, 1207 (Colo. 1987) (holding, under a prior version of the case management rules, that a party's failure to file a trial data certificate did not result in prejudice, where the other party was apprised of the witnesses and the substance of their testimony even without the filing).

19

¶ 46     Discovery rulings are within the discretion of the trial court and will not be disturbed absent an abuse of that discretion. *People in Interest of S.G.*, 91 P.3d 443, 450 (Colo. App. 2004). We also review the court's decision whether to impose sanctions under C.R.C.P. 37 for an abuse of discretion. *People in Interest of L.K.*, 2016 COA 112, ¶ 55, *rev'd on other grounds sub nom. C.K. v. People*, 2017 CO 111. When a court admits or excludes evidence, any error in its ruling is harmless unless it affects a substantial right of the party. CRE 103(a); *see People v. Quillen*, 2023 COA 22M, ¶ 14.

## B.     Additional Background

¶ 47     The standing case management order required expert witnesses to be disclosed fourteen days before trial with a summary of the expected testimony and opinion "in accordance with the provisions of C.R.C.P. 26(a)(2)(B)(II)." C.R.C.P. 26(a)(2)(B)(II) requires that a disclosure of nonretained experts include (1) "a complete description of all opinions to be expressed and the basis and reasons therefor"; (2) "a list of the qualifications of the witness"; and (3) "copies of any exhibits to be used as a summary of or support for the opinions."

¶ 48    In this case, the Department filed a witness list two months before the adjudicatory trial.  In relevant part, the list included contact information and a brief paragraph of expected testimony for a hospital nurse and a urinalysis lab technician.  The witness list did not indicate that these witnesses would be called as experts, although it disclosed that (1) the nurse cared for mother and child at the hospital, could testify to her observations and knowledge of key events, and would "testify as [to] her opinion that the child's environment present[ed] a safety issue and risk"; and (2) the lab technician collected urinalysis samples, could testify to her observations and knowledge of key events, and "communicated with the caseworker that [mother's] urine sample [wa]s not consistent with a normal urine sample and may have been contaminated with [sic] on multiple occasions."

¶ 49    The night before the adjudicatory trial, the Department disclosed (1) an internet printout of "Licensee Information" for the nurse; and (2) a resume, "Certificate of Completion" for Department of Transportation Urine Drug Testing Training, and business card for the lab technician.  On the morning of the adjudicatory trial, mother asked the juvenile court to exclude all testimony from the

nurse and the lab technician as a sanction for the Department's late disclosure of the qualifications of the witnesses. The Department argued that exclusion of the witnesses was not warranted and suggested that a continuance might be appropriate.

¶ 50 The juvenile court agreed that there was "a violation of the case management order in terms of late disclosure of CVs" but denied mother's request. In doing so, it found that the witnesses' testimony would not be a surprise to mother. Although the disclosures provided were brief, mother confirmed that she received medical records, including those created by the nurse, three months before the hearing, and the lab technician's proposed testimony was detailed in a written status report filed with the court two months before the adjudicatory hearing and was included in other discovery provided to mother.

### C. Exclusion of the Testimony

¶ 51 Mother asserts that the Department's disclosures were insufficient and that C.R.C.P. 37(c)(1) required the juvenile court to exclude the testimony of "the never-endorsed 'experts' qualifications and opinions." But mother fails to acknowledge that preclusion is not required where the failure to disclose "has not caused and will

not cause significant harm, or such preclusion is disproportionate to that harm."  C.R.C.P. 37(c)(1).

¶ 52     The juvenile court properly considered the potential harm to mother from allowing the witnesses to testify when it declined to preclude their testimony as a sanction for the Department's late disclosure of the witnesses' CVs.  The court solicited information about when discovery regarding the substance of the witnesses' testimony became available to mother and what was included in that discovery.  Finding that the documents revealing the witnesses' expected testimony had been disclosed months before the hearing, the court declined to preclude the testimony.  Importantly, mother does not suggest what further information about the witnesses' testimony could or should have been included in the disclosures. Given the totality of the circumstances, we are not persuaded that the court's ruling was manifestly arbitrary, unreasonable, or unfair.[1]

---

[1] To the extent mother argues that the witnesses' testimony should have been excluded because the Department did not identify them as "experts" in its witness list, she did not make that argument to the juvenile court, and we will not consider it for the first time on appeal.  *See People in Interest of E.W.*, 2022 COA 12, ¶ 26, *aff'd*, 2022 CO 51.

## V. Sufficiency of the Evidence

¶ 53    Finally, mother contends that there was insufficient evidence to support the juvenile court's findings that the child was dependent and neglected under sections 19-3-102(1)(c) and (g).  We disagree.

### A. Standard of Review and Applicable Law

¶ 54    "The purpose of an adjudicatory hearing is to determine whether the factual allegations in the dependency and neglect petition are supported by a preponderance of the evidence, and whether the status of the subject child or children warrants intrusive protective or corrective state intervention into the familial relationship."  *People in Interest of A.M.*, 786 P.2d 476, 479 (Colo. App. 1989).  If the petition is sustained, the juvenile court may enter a judgment of adjudication, which is not as to the parents but relates only to the child's status on the date of the adjudication. *K.D. v. People*, 139 P.3d 695, 699 (Colo. 2006).  At the adjudication stage, as elsewhere during a dependency and neglect proceeding, the best interest of the child is paramount.  *A.M. v. A.C.*, 2013 CO 16, ¶ 14.

¶ 55    In determining whether the evidence is sufficient to sustain an adjudication, we review the record in the light most favorable to the prevailing party, drawing every inference fairly deducible from the evidence in favor of the court's decision. *People in Interest of D.L.R.*, 638 P.2d 39, 41 (Colo. 1981). We will not disturb a juvenile court's findings and conclusions if the record supports them, even though reasonable people might arrive at different conclusions based on the same facts. *K.D.*, 139 P.3d at 702. The credibility of the witnesses and the sufficiency, probative effect, and weight of the evidence, as well as the inferences and conclusions to be drawn therefrom, are within the court's discretion. *Id.*

## B.    Injurious Environment

¶ 56    Mother contends that the juvenile court erred by finding that the child was or would be in an injurious environment. We discern no error.

¶ 57    A child is dependent and neglected if, as pertinent here, "[t]he child's environment is injurious to his or her welfare." § 19-3-102(1)(c). An injurious environment occurs "when a child is in a situation that is likely harmful to that child." *People in Interest of J.G.*, 2016 CO 39, ¶ 26.

## 1. Additional Background

¶ 58　Mother testified that around four months before the child was born, she asked for a protective order against her then roommate, who mother believed was putting drugs in her food. Three months before the child was born, mother "went to the hospital and asked them to find out what was in [her] system." Mother testified that she did not find out she was pregnant until that hospital visit.

¶ 59　The caseworker testified that the urinalysis test (UA) from that hospital visit was positive for methamphetamine. The caseworker testified that she met with mother after she gave birth while the child was still in the hospital. During that interview, mother attributed the positive UA to her former roommate drugging her and showed the caseworker seven clean UAs that were taken during emergency room visits in the three months before the child was born. Those UAs are not in the record.

¶ 60　The juvenile court took judicial notice of the protective order case that mother filed against the roommate. In pleadings for that case, mother represented that the roommate "told me she was gonna kill my unborn child . . . . I left . . . and went to hospital to check on baby." Mother filed these pleadings more than a month

before the hospital visit where she tested positive for methamphetamine and reportedly discovered she was pregnant.

¶ 61 After the child was born, the Department asked mother to submit to random UAs. The caseworker testified that the Department did not receive any results to demonstrate mother's sobriety during its assessment. The lab technician testified that, on two occasions, she was concerned about mother tampering with her UAs. The lab technician opined that the samples that mother presented after two unmonitored UAs were not "actual urine from her body." None of mother's UA results were entered into evidence.

## 2. Analysis

¶ 62 The juvenile court determined that the child was in an injurious environment. In so doing, the court found "on two occasions methamphetamine has been in the mother's body[,] . . . [and] on a third occasion her behavior was entirely consistent with trying to pass fake urine." The court considered the child's umbilical cord testing to infer that methamphetamine was "in mother's system at the time she gave birth to the child."

¶ 63 The record supports these findings. As mentioned above, mother tested positive for methamphetamine during a hospital visit

three months before the child was born, and two UA samples she provided after the child was born were not "actual urine from her body." The lab technician testified that the two samples mother provided had the same temperature, pH balance, and creatinine levels as samples provided by the child's father and that matching values were "not possible naturally." Furthermore, the lab technician observed anomalies in smell, color, and the absence of spatters along the wall of the cup and typical particles that would be expected in an authentic urine sample.

¶ 64 The juvenile court found mother's testimony was not credible and that "the demeanor, the claims together, sound[ed] suspicious and paranoid." The court did not find credible mother's explanation that her roommate was drugging her. And the court considered and rejected mother's testimony that she "believe[d] that [the umbilical cord test was] not correct."

¶ 65 Importantly, mother's behaviors affected the well-being of the child. Although the nurse documented that the child was fussy, agitated, and jittery due to neonatal abstinence syndrome, at the hospital mother denied that the child was exhibiting any symptoms consistent with withdrawal. The nurse testified that mother

28

prevented her from regularly assessing the child's condition. The caseworker testified that mother was upset that the hospital gave the child morphine and attempted to leave with the child against medical advice. Mother allowed the child to be moved to the neonatal intensive care unit (NICU) for treatment only after police intervened and calmed her. The hospital put mother on a behavior plan while the child was in the NICU, which also addressed concerns that mother was falling asleep while holding the child. The caseworker testified that mother's behaviors in the hospital and her inability to stay awake while holding the child caused concern that mother's substance use was impacting her ability to provide proper care for the child.

¶ 66 Because there is record support for the juvenile court's findings, we will not disturb them or the court's legal conclusion that the child was in an injurious environment. *See K.D.*, 139 P.3d at 702.

## C. The Impact of Substances

¶ 67 Because section 19-3-102 requires proof of only one condition for an adjudication, we need not consider mother's contentions that there was insufficient evidence to support an adjudication of the

child under section 19-3-102(1)(g). *See People in Interest of S.M-L.*, 2016 COA 173, ¶ 29 (a department need only prevail on one adjudicatory element alleged in the petition), *aff'd sub nom. People v. G.S.*, 2018 CO 31.

## VI. Disposition

¶ 68    We affirm the judgment.

JUDGE GRAHAM and JUDGE RICHMAN concur.